NOTICE
Decision filed 04/02/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260025-U

NO. 5-26-0025

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JEFFREY LUFFMAN, | ) | Madison County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 22-DC-325 |
| | ) | |
| MAEGEN ROZYCKI, | ) | Honorable |
| | ) | John P. Hackett, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Clarke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The judgment of the circuit court of Madison County that restricted the in-person parenting time of the petitioner father was not erroneous where the trial court's finding of serious endangerment was not against the manifest weight of the evidence, the trial court's determination that the restrictions were necessary was not an abuse of discretion, and the remainder of the defendant's arguments on appeal are contrary to the facts or otherwise without merit.

¶ 2    The petitioner, Jeffrey Luffman (Father), appeals the judgment of the circuit court of Madison County that restricted his in-person parenting time with the minor child (minor). For the reasons that follow, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4     This case was initiated on October 5, 2022, when Father filed a petition to register/enroll foreign judgment, in which he sought to register and enroll a judgment from the state of Texas that pertained to his divorce from respondent Maegen Rozycki (Mother), and to the minor, who was born in September of 2017. On April 17, 2024, Father filed a motion to modify parenting time and to allocate parental responsibilities including decision-making responsibilities and child support. In his motion, Father contended there had been a change in circumstances in that the parties now lived closer to one another, and Father was "now able to be more actively involved with the minor child's day-to-day activities." Father therefore requested "that the parties have equal periods of parenting time."

¶ 5     On February 19, 2025, the trial court ordered the appointment of a guardian *ad litem* (GAL) to represent the best interests of the minor. On May 14, 2025, the trial court entered a case management order in which it stated that Father was "to submit to an evaluation by Dr. Diane Pleasant," with a separate written order to follow. The following day, Father filed a motion to recuse the trial court judge for cause. On June 11, 2025, Mother filed a "motion to modify to restrict allocation of parental responsibilities," in which she alleged that Father was "jeopardizing the minor child's best interest by engaging in antagonistic conduct with [Mother] and with the minor child's school, and doctors' office." She alleged Father's "behavior endanger[ed] the minor child's physical, mental, and emotional well-being." Mother requested that Father's "parental allocation of responsibilities be restricted."

¶ 6     On July 7, 2025, following a hearing on June 30, 2025, Father's motion to recuse the previous trial court judge was denied by another judge. On July 9, 2025, the previous judge entered an order stating that the trial court was appointing "Dr. Diane Pleasant to conduct a mental health

2

evaluation" of Father, and that Dr. Pleasant was to submit a report that included her conclusions "relating to the allocation of parental responsibilities and/or the child's relocation." The order stated that Father was to contact Dr. Pleasant "within 7 days of the entry of [the] order to schedule" his appointment.

¶ 7    On September 22, 2025, a hearing was held on several of the parties' pending motions. Of relevance to this appeal, Father, who appeared *pro se*, raised the issue of the mental health evaluation, stating that it presented "a huge barrier" to him, due to his financial circumstances, which he alleged rendered him unable to afford to pay for the evaluation. Father stated that the cost of the evaluation, along with fees he owed to previous attorneys who represented him in the case, and the GAL fee, amounted to "a large amount of money." Father added, "I'm here today to say I don't have it – I don't have it." The trial court noted that the mental health evaluation was "not a portion of the" motions before the court that day, and therefore the court would not address it.

¶ 8    In an order entered on October 29, 2025, the trial court stated that a hearing would be held on November 24, 2025, at which the trial court would hear several of Father's motions, and would hear Mother's June 11, 2025, "motion to restrict parenting time." At the case management conference also held on October 29, 2025, the issue of the mental health evaluation was revisited. Mother's counsel stated that Father still had not scheduled an appointment with Dr. Pleasant, despite the trial court's order, which counsel opined was "kind of slowing down resolution of the entire case." The trial court asked if Mother's counsel had filed "any petitions" regarding the issue. Mother's counsel conceded that he had not, and the trial court stated that it would "not make any ruling, being that there's no petition on file." The trial court added that "we've got to get that done" because "[t]he [c]ourt ordered that." The trial court noted that Father objected to the evaluation,

3

but that "[n]evertheless, that is the order of the [c]ourt." In response, Father stated, "I don't see any time soon where I'm going to have the extra $5,000 for this," and added, "I don't know how else I can say that I don't have the money to fulfill this requirement." The trial court again declined to rule on the issue in the absence of a petition from Mother's counsel.

¶ 9    At the November 24, 2025, hearing, the trial court first heard Mother's motion to restrict parenting time. Of relevance to this appeal, Mother testified that Father had caused "disruptions" at the minor's school, and that as a result of proceedings initiated by the school, Father was "banned" from being present at the school. Mother testified that the minor's physician had "dropped" the minor due to "the environment that was created when [Father] started coming around." She testified that Father "would just show up unannounced, causing a little bit of chaos, just being a disruption for us with him in the building." Mother testified that attempting to parent with Father during the previous 12 months had been "[r]eally difficult," because of a "barragement of emails and text messages." She testified that Father sometimes contacted her "onwards of 20 times a day." Mother testified that Father's behavior had a negative impact on the minor, who "wouldn't want to listen to" Mother, and who would state things like, " 'That's not what my dad said.' "

¶ 10    Mother testified that she believed Father undermined her parenting by giving the minor "whatever she wants" and telling the minor that if the minor lived with Father, Father would home school her so she would not have to go to school. Mother testified that after the minor "had it drilled into her head that she was going to be able to come home and go to his house and go to home school," the minor became "really oppositional" about school and her school performance suffered. Mother testified that she did not believe any contact between Father and the minor was in the minor's best interests, because when there was contact, the minor returned "home very

4

confused about who she can believe" and "question[ed] who she can trust in her household." Mother testified that she had observed Father's behavior with his three older children, that Father was "very hard on them," and that she worried about the minor, who would "come home sad" from her visits with Father. She testified that the minor's school performance had improved since Father was banned from the school. On cross-examination, Mother testified that she believed it was inappropriate for Father to tell the minor that when Father won "the court case against the school," Father would take the minor on a vacation.

¶ 11 On direct examination by Mother's counsel, Father agreed that he was banned from the minor's school, as well as every other school in her school district, and that an active order of protection barred him from contacting certain individuals at the minor's school. He testified that the order of protection also prevented him "from conducting Freedom of Information Act requests to the schools," and "from talking about them on social media." He testified that the minor's doctor stated that the minor "would not be able to seek any care there," but Father stated that it was because he filed a complaint about the doctor's performance. He agreed that he was ordered to undergo a psychological evaluation, and that he had not done so. He further agreed that the order required him to pay Dr. Pleasant, and that he had not done so. He testified that he "contacted [Dr. Pleasant] immediately upon receiving the order and then tried to verify that she could actually perform the work required [by the order] and she cannot." Father denied that he had "conflict" with the minor's doctor, stating "I characterize it as advocacy" and contending that until Father intervened, the doctor overlooked serious health issues with the minor. He agreed that the trial court's order did not direct him "to inquire to Diane Pleasant about her credentials," but Father stated that if he was going to pay $5,000, he wanted "to be certain" what he was paying for. He added that, "as it turns out, she's not credentialed to provide this per law."

5

¶ 12    In lieu of cross-examining himself, Father was given the opportunity to provide a statement to the court. Father stated that he believed that once he filed for equal parenting in 2024, it was Mother whose "demeanor" changed, and that "she started to limit" his interactions with the minor. He stated that he believed his inquiries into how the minor was doing were "normal" and should not be the basis for preventing him from having time with the minor. He stated that he believed that "to sum it up, Your Honor, we went through this period of cooperation," but that when he asked for equal parenting, "it became zero cooperation, and that created issues." He added, "I think that it's well within my right as a parent to disagree with a teacher or disagree with a doctor" with regard to the health and best interests of the minor. Thereafter, Father asked to present character witnesses, but because he had not disclosed the witnesses to Mother's counsel prior to the hearing, Father's request was denied.

¶ 13    Father was again given the opportunity to make a statement relevant to Mother's motion to restrict parenting time. Father stated that he believed his parenting time could be restricted only if the trial court found "serious endangerment" to the minor. He stated that there was no evidence that he had abused the minor, and that he had taken and passed a court-ordered drug test. He further stated that there was no evidence that he had "ever endangered the child's physical, mental, moral, or emotional health," which meant that restrictions could not be imposed. Father stated that he believed Mother was making "a conscious attempt to undermine the co-parenting relationship," and that none of the evidence presented formed "a basis for refusing [Father's] parenting time."

¶ 14    The trial court asked Father if he wished to respond to the allegation that his "behavior with the doctor or the school [had] negatively impacted the" minor. Father responded that his "issues with the doctor" were advocacy for the minor's then-undiagnosed "hearing deficit." He stated that he did not believe being banned from the minor's school was an issue because he lived

6

across the street from the school and the minor could walk to his house after school if he were allowed to see her. He reiterated that he believed it was Mother, not him, who was being difficult. He added that he did not believe sufficient evidence had been presented to justify restricting his parenting time.

¶ 15 The GAL testified that he had met with both parties, and with the minor, and had reviewed the pending motions, pleadings, and other documents in the case. He testified that his "issue" in this case was Father's failure to have an evaluation by Dr. Pleasant, even though it appeared from financial affidavits Father had filed that Father had "the money to do so." He testified that he believed Father loved the minor, that the minor loved Father, and that Father would not "intentionally physically harm his daughter." He testified that he believed that based on the testimony at the hearing about the school issues, the doctor issues, and other issues with Father, "Dr. Pleasant could provide us some information that we don't otherwise have."

¶ 16 The GAL testified that he did "[n]ot really" want to restrict Father's parenting time, but that "we probably have to in order to get him in that evaluation process so we can get a report back from the doctor to let us know some of these issues," such as whether there were "mental issues or other psychiatric issues that [could] be fixed." He testified that he believed that "ignoring that order or continuing to argue that order to where the evaluation never happens, I think, could lead to a serious endangerment potentially." He testified that he had prepared part of a report, but that he did not believe he could complete the report without the mental health evaluation. He testified that his present recommendation was "that a restriction is necessary, at least in the short term, until he's complied with the court order and has [completed] his evaluation." He testified that he did not see any evidence of "parental alienation" by either parent, but that he believed things were "confusing" for the minor and that she did feel "a pull both ways." He agreed with the trial court

7

that the "strain or effect on the" minor was being exacerbated by "the prolonging of [the court] proceedings," including the mental health evaluation.

¶ 17 When questioned by Mother's counsel, the GAL stated that he believed the minor "definitely want[ed] some resolution to this," and did not "want her parents fighting." He agreed that as long as Father was "refusing to cooperate with the order appointing the evaluator," Father's conduct endangered the minor's mental, emotional, and moral well-being. He testified that Father was "keeping this case in limbo," which was "not good for [the minor]" and "not healthy for her." Upon questioning by Father, the GAL reiterated that he believed Father's issues with the school were sufficient to require a mental health evaluation of Father. The trial court thereafter stated that it would take Mother's motion to restrict parenting time under advisement and issue a written order.

¶ 18 On January 2, 2026, the trial court entered its written order. Therein, the court stated that the court was "faced with [Father's] continued devolution into constant conflict, a state he did not present in when [the court] entered its previous" parenting order. The court found "by a preponderance of the evidence that [Father] engaged and continue[d] to engage in conduct that seriously endanger[ed] the [minor's] mental health and emotional development." The court stated that its order restricting Father's parenting time was "entered in accordance with the [c]ourt's authority as outlined in 750 ILCS 5/603.10." The court stated that because it had found that a change in circumstances existed, it must determine what was in the best interests of the minor. The court laid out the factors it considered, and in so doing made the following findings: (1) the minor "tend[ed] to be more disruptive with [Mother] following the [minor's] visits with [Father]" and would "question the authority of [Mother] in a manner inconsistent with the [minor's] usual behavior;" (2) although the minor might "be able to adjust to the community environment created

8

by" the fact that Father was banned from the minor's school, that did "not necessarily lead the [c]ourt to deduce that the community environment created by" Father was in the minor's best interest; (3) despite the court's concerns about Father's mental health, and the court's order of a mental health evaluation, the order had "been ignored," which caused further concern for the court; (4) Father's testimony included that he "had disagreement with school officials which led to an [o]rder of [p]rotection," as well as "disagreement with the [minor's] treating physicians, which led to the [minor] being terminated as a patient," and "disagreements with past legal counsel," along with multiple state and federal lawsuits that, while well within Father's rights, nonetheless "signal[ed] disagreement;" (5) the court believed Father was not acting in the best interests of the minor when Father "engag[ed] in constant disagreement;" (6) the minor was "impressionable," would benefit from having a relationship with both Mother and Father, and "would benefit from a less conflict-ridden environment;" (6) a restriction on Father's parenting time was "appropriate;" (7) at the present time, Father was "not able to place his child's needs above his own;" and (8) Father "appear[ed] to be manipulating the [minor] by introducing options like home school with" Father, which was problematic because it caused the minor to question with Mother why the minor should have to go to her current school.

¶ 19    The trial court reiterated that it "harbor[ed] much concern about the mental well-being of" Father, and that Father meeting with Dr. Pleasant "could reduce [the court's] concern." The court stated that this had "been conveyed to" Father, but that Father still "avoid[ed] it." The court stated that Father's conduct was being considered only as it "directly affect[ed]" Father's relationship with the minor. The trial court then stated that it found that it was "in the best interest of the [minor] that she have reduced in-person contact with" Father, and that accordingly, Father's "parenting time is hereby restricted until further [o]rder." The trial court stated that "[i]n an effort to maintain

9

a bond with the subject minor, the parties may work out a video visitation schedule for" Father, and that if the parties could not work out a schedule that allowed Father "three thirty-minute video calls" per week, the court would "determine the schedule."

¶ 20    On January 8, 2026, a hearing was held on motions the court did not have time to consider at the November 24, 2025, hearing. At the outset of the hearing, Father announced that there were "new facts" he wished the trial court to consider regarding a recent move by Mother. The trial court asked Father to file a written motion, noting that Father was "well versed in filing motions." With regard to the two remaining motions—a motion for contempt, and a motion to strike— Mother's counsel contended each motion had "procedural deficiencies." The trial court asked Father to present his motion to strike, in which Father requested that the court strike its previous order requiring Father to undergo a mental health evaluation. Father stated that Dr. Pleasant had indicated to him that she "could no longer be neutral" which led Father to argue that compliance with the court's order was "no longer possible." The trial court denied Father's motion to strike. The trial court thereafter stated that Father's motion for contempt contained "no cognizable claim that the court could even liberally construe" because it simply referred to voluminous attachments. The court stated that "so much as the court wishes to liberally construe a *pro se* motion, it has to at least make sense, and this motion does not do that." The court added, "It does not identify even a prayer for relief or a complaint." The trial court denied the motion for contempt, stating that "[a]ny other construction of the motion would require the court to fill in the blanks, if you will, to essentially make sense of the insensible and, of course, this court cannot do that."

¶ 21    Father thereafter stated, "Your Honor, with regards to the [January 2, 2026,] order, it states that there are some video calls that are a part of the plan." Father stated that he wished to "request that we have a court-ordered communication platform, because [Father had] no way of verifying

10

compliance if [he] use[d] Facetime." He added, "I can't log that, so I want to be able to very clearly indicate to the court compliance to any orders." Mother's counsel did not object, and the trial court agreed it was "a great idea."

¶ 22    The trial court subsequently asked, "Where do we stand on the evaluation by Dr. Pleasant?" Mother's counsel stated that there was "a major development there" because "Dr. Pleasant sent a letter indicating that due to [Father's] repeated …" However, Mother's counsel did not finish his sentence, apparently because Father interrupted, stating "I have the letter, your Honor. We can read it. We don't have to characterize what she said." The court asked for "the ultimate status," and Father stated that Dr. Pleasant could not "proceed with the evaluation due to her not being able to maintain neutrality." Mother's counsel described Father's characterization of the letter as "not entirely accurate."

¶ 23    The trial court stated that it was "incredibly hesitant to disrupt any relationship between a parent and a child," and that it desired "this relationship to be able to be maintained." The court stated that it would not reiterate its order, but that the case involved "some things going on that are of serious concern." The court stated that it believed it had "identified almost a path forward to resolve some of those in the order, but now what the court is presented with is an e-mail from Diane Pleasant" that read " '[Father] and Other Parties, [i]t's impossible to proceed. As a 604.01 evaluator, it is my role to remain a neutral party. With receipt of the subpoena on 11/6/2025 and additional unwarranted conduct with [Father] since, it is not feasible for my services to be rendered impartial.' " Father thereafter stated that his issues with Dr. Pleasant did not make Father "a person of conflict," and that he was simply "advocating" for himself by asking Dr. Pleasant for her credentials and qualifications. He stated that the problems in this case arose after he asked for equal parenting, and added, "I don't see where the facts indicate I'm the source of the conflict."

11

The trial court reiterated that it was concerned about Father's mental health. The court stated, "you've never come into this courtroom a single time and been disrespectful, rude, obtuse, anything but a gentleman representing your own interests." The court added, "But I'm concerned." The GAL then suggested that a different provider be appointed to conduct the mental health evaluation. The trial court stated that the reasons for requiring an evaluation "exist[ed] as they did [previously] and more." The trial court ordered the appointment of Dr. Hoevet to conduct the evaluation, and Mother's counsel agreed to prepare a typewritten order covering the appointment of Dr. Hoevet and other issues.

¶ 24     Also on January 8, 2026, Father filed a notice of appeal in which he stated that he wished to appeal "the final order entered on January 2, 2026 *** which modified and restricted [his] parenting time." He stated that he sought "review of all adverse findings, rulings, and relief contained in the January 2, 2026, [o]rder, including all legal and constitutional issues preserved in the record." He asked this court to "reverse the January 2, 2026, [o]rder restricting parenting time, vacate any findings unsupported by law or evidence, and grant such other and further relief as justice require[d]."

¶ 25                                    II. ANALYSIS

¶ 26     An order that restricts parenting time is governed by section 603.10 of the Illinois Marriage and Dissolution of Marriage Act (Act). *In re Marriage of Hipes and Lozano*, 2023 IL App (1st) 230953, ¶¶ 1, 36; 750 ILCS 5/603.10 (West 2024). A restriction on parenting time is defined by section 600(i) of the Act as "any limitation or condition placed on parenting time, including supervision." *Id*., ¶ 36; 750 ILCS 5/600(i) (West 2024). Before a trial court may impose a restriction on parenting time, the court must find, by a preponderance of the evidence, that the parent whose time is being restricted engaged in conduct that seriously endangered the minor's

12

mental, moral, or physical health or that significantly impaired the emotional development of the minor. *Id.*, ¶ 36; 750 ILCS 5/603.10(a) (West 2024).

¶ 27　The restriction of parenting time pursuant to section 603.10 is a two-step process. *Id.*, ¶ 43. The first step requires the trial court to determine whether the parent's conduct seriously endangered the child. *Id.* The burden of proving serious endangerment is on the party moving to restrict parenting time. *Id.* The question of serious endangerment includes the potential for harm in the future, which means the trial court does not have to wait until the child has suffered actual, tangible harm before making a finding of serious endangerment. *Id.*, ¶ 44. On appeal, this court determines whether the trial court's finding of serious endangerment is against the manifest weight of the evidence. *Id.*, ¶ 43. A finding by the trial court is against the manifest weight of the evidence only if, upon review of the entire record, the opposite conclusion to that of the trial court is clearly evident. *Id.*

¶ 28　The second step in the process, which arises only if there has been a finding by a preponderance of the evidence of serious endangerment, is for the trial court to determine what restrictions are necessary to protect the child. *Id.*, ¶ 54. Restrictions may include "a reduction, elimination, or other adjustment of *** parenting time," or "any other constraints or conditions that the court deems necessary to provide for the child's safety or welfare." 750 ILCS 5/603.10(a)(1), (a)(9) (West 2024). This court reviews the trial court's determination that certain restrictions are necessary for an abuse of discretion. *In re Marriage of Hipes and Lozano*, 2023 IL App (1st) 230953, ¶ 54. A trial court's ruling is an abuse of discretion if it is arbitrary, fanciful, or unreasonable, or if no reasonable person would take the view adopted by the trial court. *Id.*

¶ 29　On appeal, Father claims the trial court abused its discretion when it restricted his parenting time "without findings under 750 ILCS 5/603.10 and by relying on an interim [o]rder of

[p]rotection and generalized 'conflict.' " He argues that the January 2, 2026, order contained no findings of serious endangerment. However, the record belies Father's contentions. First, as described above, the order on its face referenced that it was "entered in accordance with the [c]ourt's authority as outlined in 750 ILCS 5/603.10." Second, the order expressly stated that the trial court found by a preponderance of the evidence that Father had engaged, and continued to engage, in conduct that seriously endangered the minor's mental health and emotional development, which was a finding by the trial court under section 603.10. The order further found that the court was "faced with [Father's] continued devolution into constant conflict, a state he did not present in when [the court] entered its previous" parenting order, which was another finding by the trial court under section 603.10. When considering the best interests of the minor, the trial court made a specific finding that despite the court's concerns about Father's mental health, and the court's order of a mental health evaluation, the order had "been ignored," which caused further concern for the court. Near the end of the order, the trial court reiterated that it "harbor[ed] much concern about the mental well-being of" Father, but that Father refused to be evaluated.

¶ 30      There is no support in the record for Father's suggestion that the trial court based these findings on the interim order of protection or on "generalized" notions of conflict. The trial court's findings are supported by the testimony adduced at the hearing from Mother, Father, and the GAL, all of which is recounted in detail above. Of particular significance to this issue, the GAL testified that he believed that "ignoring [the mental health evaluation] order or continuing to argue that order to where the evaluation never happens, I think, could lead to a serious endangerment potentially." He testified that his present recommendation was "that a restriction is necessary, at least in the short term, until he's complied with the court order and has [completed] his evaluation." Moreover, the GAL agreed with the trial court that the "strain or effect on the" minor was being

14

exacerbated by "the prolonging of [the court] proceedings," including the mental health evaluation Father refused to undertake. He agreed with Mother's counsel that as long as Father was "refusing to cooperate with the order appointing the evaluator," Father's conduct endangered the minor's mental, emotional, and moral well-being. He testified that Father was "keeping this case in limbo," which was "not good for [the minor]" and "not healthy for her."

¶ 31   Mother also provided testimony that supported the trial court's conclusion that Father's "devolution into constant conflict" seriously endangered the minor's mental health and emotional development. She testified that Father's behavior had a negative impact on the minor, who "wouldn't want to listen to" Mother, and who would state things like, " 'That's not what my dad said.' " She testified that after the minor "had it drilled into her head that she was going to be able to come home and go to his house and go to home school," the minor became "really oppositional" about school and her school performance suffered. Mother testified that she did not believe any contact between Father and the minor was in the minor's best interests, because when there was contact, the minor returned "home very confused about who she can believe" and "question[ed] who she can trust in her household." Mother further testified that she had observed Father's behavior with his three older children, that Father was "very hard on them," and that she worried about the minor, who would "come home sad" from her visits with Father. In short, Mother provided specific testimony about how Father's behavior was detrimental to the minor's mental health and emotional development, which supported the trial court's serious endangerment finding and was based on actual, not "generalized," conflict.

¶ 32   Father also provided testimony that supported the trial court's conclusion that Father's "devolution into constant conflict" seriously endangered the minor's mental health and emotional development. In his testimony, Father minimized the negative impact that his conflict with the

15

school and the minor's doctor had on the minor, and he attempted to blame Mother for fomenting conflict, testifying that it was only in 2024 that problems arose, when he sought equal parenting time. Father's testimony demonstrated a lack of insight into his own behavior and how that behavior could be negatively impacting the mental health and emotional development of his young, impressionable daughter.

¶ 33    We reiterate that we review the trial court's finding of serious endangerment under the manifest weight of the evidence standard. *In re Marriage of Hipes and Lozano*, 2023 IL App (1st) 230953, ¶ 43. As explained above, a finding by the trial court is against the manifest weight of the evidence only if, upon review of the entire record, the opposite conclusion to that of the trial court is clearly evident. *Id*. In this case, in light of the testimony we have discussed above, and our review of the entire record, we do not believe the opposite conclusion to that of the trial court is clearly evident. This is particularly true because, also as explained above, the question of serious endangerment includes the potential for harm in the future, which means the trial court does not have to wait until the child has suffered actual, tangible harm before making a finding of serious endangerment. *Id*., ¶ 44. Accordingly, the trial court's finding of serious endangerment in this case was not against the manifest weight of the evidence and we will not disturb it.

¶ 34    After making its serious endangerment finding, the trial court concluded that it was "in the best interest of the [minor] that she have reduced in-person contact with" Father. As a result, the trial court restricted Father's in-person parenting time until further order. However, the trial court stated that "[i]n an effort to maintain a bond with the subject minor, the parties may work out a video visitation schedule for" Father, and that if the parties could not work out a schedule that allowed Father "three thirty-minute video calls" per week, the court would "determine the schedule." To reach its conclusion about the best interests of the minor, the trial court considered

a number of factors and made findings related thereto, which are set out in detail above. Particularly relevant to the restrictions placed on Father's in-person parenting time—and to the trial court's provision of a video visitation option—are the trial court's findings that (1) the minor "tend[ed] to be more disruptive with [Mother] following the [minor's] visits with [Father]" and would "question the authority of [Mother] in a manner inconsistent with the [minor's] usual behavior," and (2) the minor was "impressionable," would benefit from having a relationship with both Mother and Father, and "would benefit from a less conflict-ridden environment."

¶ 35 As explained above, this court reviews the trial court's determination that certain restrictions are necessary for an abuse of discretion. *Id*., ¶ 54. A trial court's ruling is an abuse of discretion if it is arbitrary, fanciful, or unreasonable, or if no reasonable person would take the view adopted by the trial court. *Id*. In this case, the trial court restricted Father's in-person parenting time, but offered a reasonable alternative of video visitation that included "three thirty-minute video calls" per week, all after considering the minor's best interest and making findings of fact that were supported by the testimony provided at the hearing. Under these circumstances, we do not believe the trial court's determination was arbitrary, fanciful, or unreasonable, and we do not believe that no reasonable person would take the view adopted by the trial court. We therefore conclude the trial court's determination that the restrictions were necessary was not an abuse of discretion, and we will not disturb it.

¶ 36 Father raises three additional issues on appeal. First, he claims the trial court "refused to hear" his contempt motion, even though it was "filed on a court form." He claims this was "a refusal to adjudicate, not a merits denial" and that it denied Father "meaningful access to the courts" because the trial court was required to "construe *pro se* filings liberally." Again, the record belies Father's contentions. As described above, when asked to rule on the motion for contempt,

17

the trial court stated that the motion contained "no cognizable claim that the court could even liberally construe" because it simply referred to voluminous attachments. The court even stated that it wanted "to liberally construe a *pro se* motion," but that for the court to do so, the motion had "to at least make sense," and that Father's motion did "not do that." The court added, "It does not identify even a prayer for relief or a complaint." The trial court denied the motion, stating that "[a]ny other construction of the motion would require the court to fill in the blanks, if you will, to essentially make sense of the insensible and, of course, this court cannot do that." This was absolutely a denial on the merits of the motion as it presently existed, not a refusal to adjudicate. In addition, the trial court did not base its denial on whether the motion was "filed on a court form" – it instead considered the merits of the motion as drafted and found the motion to be nonsensical. However, the court's denial was without prejudice, which meant that Father could file a renewed, or amended, motion that was not nonsensical, if Father so chose. Accordingly, there was no error on the part of the trial court, and Father was not "denied meaningful access to the courts."

¶ 37    Father next claims that the trial court "directed preparation of sanctions for raising jurisdictional issues" although Father concedes that no sanctions were issued, and no hearing was held on possible sanctions. He nevertheless claims that "[t]hreatening sanctions without adjudication chills access to the courts" and is improper. With regard to this claim, we note the longstanding rule that "[t]he existence of an actual controversy is an essential requisite to appellate jurisdiction, and courts of review will generally not decide abstract, hypothetical, or moot questions." *In re Marriage of Nienhouse*, 355 Ill. App. 3d 146, 149 (2004). Because no sanctions were issued in this case, there is no actual controversy before this court, and no order for this court to review with regard to sanctions. In the absence of actual sanctions, we decline to address Father's abstract and hypothetical question of whether the threat of sanctions might chill access to

18

the courts. We further note that the record does not support Father's statement that the trial court "threatened" sanctions. At the pages cited in the record by Father, the trial court agreed that Mother's counsel had filed a motion for sanctions in response to allegedly frivolous filings by Father. The trial court stated that it had reserved ruling on Mother's counsel's motion for sanctions. This cannot be construed reasonably as a "threat" by the trial court – it was a simple statement of the procedural posture of Mother's counsel's motion. For all these reasons, Father's claim regarding "threatened" sanctions is without merit.

¶ 38    Finally, Father claims the trial "court erred by maintaining restrictions while relying on a psychiatric evaluation process that was never capable of completion." He contends that once Dr. Pleasant bowed out of the case, he moved to strike the requirement of a mental health evaluation, and that "the court did not rule[,] and no substitute order issued." Again, the record belies Father's contentions. As described above, when the trial court learned that Dr. Pleasant would not continue to be involved in the case, the trial court reiterated its concerns about Father's mental health. The GAL then suggested that a different provider should be appointed to conduct the mental health evaluation, and the trial court stated that the reasons for requiring an evaluation "exist[ed] as they did [previously] and more." The trial court ordered the appointment of Dr. Hoevet to conduct the evaluation, and Mother's counsel agreed to prepare a typewritten order covering the appointment of Dr. Hoevet and other issues. Thus, it is factually incorrect to state that the trial court did not rule on this issue. Moreover, it also is factually incorrect to state that the "psychiatric evaluation process *** was never capable of completion." Father had ample time to complete the process before Dr. Pleasant removed herself from the case. He now has the opportunity to complete the process with Dr. Hoevet. Because Father's argument is contrary to the facts, it has no merit.

19

¶ 39                                    III. CONCLUSION

¶ 40    For the foregoing reasons, we affirm the judgment of the circuit court of Madison County.


¶ 41    Affirmed.